FILED
DISTRICT COURT
DISTRICT OF NEBRASKA

IN THE UNITED STATES DISTRICT COURT 15 JUN 22 AM 8: 05
FOR THE DISTRICT OF NEBRASKA

OFFICE OF THE CLERK

| | | |
|---|---|---|
| CAROL SAMWAY, | ) | **CASE NO. 8:CV-00103** |
| | ) | *8:12 CV 103* |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| RUSTY ECK FORD, | ) | |
| Defendant. | ) | |

THIS MATTER came on for trial on April 22 and 23, 2015 on Plaintiff's Complaint for Sexual Harassment. Plaintiff was represented by Joy Shiffermiller of Shiffermiller Law Office PC LLO, and Defendant was represented by Heidi A. Guttau-Fox and George Martin of Baird Holm LLP. The parties Motion to Sequester was granted. Exhibits 1, 3, 4, 5, 6, 20, and 101-115 were offered and received. Defendant's Motion for Directed Verdict was taken under advisement. The parties submitted briefs and the matter was taken under advisement.

Being fully advised in the premises, having reviewed the exhibits, briefs submitted by the parties and other legal authority, the Arbitrator finds and Orders Plaintiff's Complaint should be dismissed as hereinafter set forth.

## INTRODUCTION

Plaintiff brings this action pursuant to Title VII (42 U.S.C. 2000 e-5). Plaintiff was hired by Defendant in June, 2009, for an outside sales position in the Parts Department. (Ex. 1) Her supervisor in the Parts Department was Steve Mahoney. In September of 2009, Plaintiff made complaints to Defendant's regional manager about Steve Mahoney. (TR at 168-172; at 224-226; at 325-326) Following her complaint, Plaintiff continued to work in the Parts Department reporting to Steve Mahoney.

In February, 2010, Plaintiff complained again to a second manager of Defendant, specifically, of sexual harassment by Steve Mahoney. (Ex. 106) Defendant immediately

conducted an investigation in February, 2010, (Ex. 107) and following the investigation Plaintiff

was offered a position in the Body Shop Department. Plaintiff moved from the Parts Department

to the Body Shop Department where she was supervised by Tom McFinch. She had no further

contact with her previous supervisor Steve Mahoney. In June, 2010, Plaintiff was terminated by

Defendant. (Ex. 20 at p. 11) Plaintiff filed a Charge of Discrimination with the NEOC. (Ex. 109)

NEOC found the evidence failed to support the Charge of Discrimination. (Ex. 110)

Following the exhaustion of administrative remedies, Plaintiff filed suit against

Defendant alleging sexual harassment on the basis of her sex. Plaintiff requests damages.

Defendant has denied Plaintiff's allegation and is requesting its costs and fees incurred in

defending the case.

## FACTUAL BACKGROUND

Plaintiff worked for Defendant from June 15, 2009 (TR at 124) to June 2010, when she

was terminated. Between June 2009 and February 2010, she worked in the Parts Department as

a Sales Representative reporting directly to the Supervisor, Steve Mahoney. Plaintiff claims

Mahoney sexually harassed her. (TR at 212)

Specifically, Plaintiff claims the following, as set forth in Exhibit 106:

Harassment from Steve Mahoney at Rusty Eck Ford

Submitted in writing 2/5/2010 to Julie Caples

Interview w/Ken & Steve

May 2009: During a conversation with Steve, I accidently said "play pen" when
we were discussing the 'pay plan'. Steve said he liked what he heard about me
being in the play pen and that we would get along just fine.

June 2009: I was introduced for the first time to Andrew Bangston, Tom White
and Dave Novy. Steve introduced me as his new 'female' sales rep. Quote: "Just
look at her ... who wouldn't buy from her."

June 2009 - Robert Goday, Tom White, Dave Novy and Dianne Sherrill were in
the parts department at about 4:30PM. Steve again referred to my female gender

2

and made this comment to Robert ...  "that's why I hired her ....she doesn't need to know anything about parts when they look like that."

June 2009:  On National Blonde Day, Steve commented that it was Ok if I made a mistake because it was National Blonde Day.  Steve made the comment to Rod Flynn (Ford Sales Rep) that I wasn't really a blonde, that he knew this. (Implying he knew personally I wasn't a true blonde.)

June 2009:  Russ Francis (Omaha Beef) stopped into the dealership and we (Russ and I) were talking about tickets for ladies night football game.  Russ said he was going to give me some tickets for the game.  Steve came over and interrupted us and asked Russ if he could get some tickets for the women's night football game. He said; "maybe if you could get 10,000 women in an arena .....I could get laid."

August 2009:  Steve called Barb to ask her to see if a customer had been set up? (He was on speaker phone as he is 90% of the time)  He rudely asked if she had received a credit application for Maaco?  She said she had and Steve said "Why the 'fuck' didn't you call me?  Barb said she didn't know it was for the parts department.  Steve said it's a body shop isn't it?  Why can't you do your fucking job?  Barb said 'Not today Steve. please.  Steve hung up the phone and said: "That fucking CUNT.  That dumb bitch can't do her job."  Nancy, another gal in accounting came by Steve's office a few minutes later to ask why Steve called Barb a bitch?  Steve told Nancy that she was a bitch and that one reason was because when Barb and Christa went to a bar one evening and got drunk, Barb kept calling him grandpa.  He wasn't happy about being called old, and (as he was telling Nancy) he said he was so mean to Barb that she was in tears at the bar.. Christa made him go apologize to her and he didn't feel he needed to.  Steve said she was a 'Fucking CUNT".   An hour later or so, Andrew Bangston (Service Manager) was in the office and Andrew said "you really didn't call her a 'CUNT' did you?"  Steve said, I sure did and she is one."  I said to Steve and Andrew that I felt that was one of the worst names you could call someone and shouldn't ever be used, especially in the work place.

October 16, 2009 - Steve called at 2 PM today to tell me the AFLAC guy was in the dealership, I told him I was with clients and would be in as soon as I was done.

When I came into the dealership, Steve said...what the hell where did I disappear to yesterday.  I was there and then I wasn't.   I said I was in for over 45 minutes and he didn't say anything to me. I said ...did you need something?

I went to see if AFLAC rep was still in the break room and when I returned Steve was looking at Porn on the computer.  Boobs and much...much more.  Tom White was standing there and when I entered the office they both laughed and Tom said hey...Carol wants to see that.  Steve said 'what...I don't know what you're talking about'  I said that porn and woman with boobs ... no I don't need to see it.

11/17/10- BJ from Ford Motor stopped in as a sales visit, Robert Goday walked back with BJ to Steve's office. Steve introduced me to BJ and said, hey have you met my girlfriend. BJ and I both said we had met each other before and BJ said you are outside sales, correct and I said 'yes' NOT Steve's girlfriend ... I never agreed to that role. EVER.

1/9/10 Steve now calls me honey or sweetheart all the time. I came in on Saturday to help with the inventory. 8 am and we left at 8 pm. I stood around for about 6 hours of the day because they didn't have enough work for everybody to do. When I asked Steve what I could start on, he told Dave Novy while in my presence that he was going to give me the STD bin to work on. When I asked what STD bin was? they laughed.
(Ex. 106 – Report given by Plaintiff to employee Julie Caples on February 5, 2010).

In September, 2009, Plaintiff arranged a meeting with Ken Haskett, Director of fixed operations, essentially over the parts, service and body shop for all the Rusty Eck dealerships. (TR at 321-323). Haskett states Plaintiff had concerns about her manager Steve Mahoney and his management style. Haskett further states Plaintiff claimed Mahoney didn't give her direction, that he was a "micromanager" with a "blustery personality," but did not mention anything "remotely even construed as harassment or sexual harassment by Mahoney." (TR at 326) McFinch contends Plaintiff was disappointed in the way Mahoney managed her, frustrated with his manners and some of the language he used. (TR at 273)

Plaintiff contends she gave Haskett the information set forth above in Ex. 106, and specific examples of name calling and comments about her being female. ( TR at 210-214)

After the meeting with Haskett, Plaintiff claims the sexual harassment was less frequent, but still occurred and Mahoney was angry with her. (TR at 229) See also, (TR at 230-231) and (Ex. 109)

There is no dispute that in February, 2010, Plaintiff made specific sexual harassment complaints to management regarding Steve Mahoney, all as set forth in her notes to Julie Caples. (Ex. 106)

Following the specific complaint by Plaintiff, Defendant's representatives Robert Goday and Julie Caples immediately conducted an investigation of Plaintiff's complaints all as set forth on Ex. 107. They interviewed a number of employees that work with Mahoney as well as Plaintiff and Mahoney. Employees confirmed they had heard Mahoney use "graphic profanity," the work "fuck," "crude language," that he "yells," called another woman in the office "fucking cunt, whore or bitch." "nice ass," "speaks freely to all employees in a derogatory manner." Some employees indicated using "graphic language" was an everyday occurrence in the car industry. (Ex. 107); (TR at 134) Mahoney was described as "an aggressive manager that could not control his temper." (Ex. 107) Mahoney admits using graphic language, viewing porn on the computer, and yelling at employees, but denies sexual specific comments. (Ex. 107)

McFinch testified he was surprised Defendants were doing a sexual harassment investigation, because that term had never come up with him from Plaintiff. (TR at 280-281)

Following the investigation, Defendant offered Plaintiff two options, one to continue to work in the Parts Department but report directly to Mahoney's boss, and not Mahoney; or second, move to the Body Shop Department as a sales representative and report to Tom McFinch. (TR at 330) Plaintiff was pleased with the interview and the options given her. (Ex. 108); (TR at 253-254) Plaintiff had initially been recommended to Defendant as a hire by Tom McFinch, (TR at 270; Ex. 112 at p. 38) and Plaintiff is good friends with McFinch's wife. (TR at 60; Ex. 112 at p. 37) Plaintiff moved to the Body Shop Department, reported directly to Tom McFinch, and following that move in February 2010 had no further contact with Steve Mahoney. (TR at 254 )

McFinch terminated Plaintiff's job in June 2010, and eliminated several positions due to the fact "Omaha operation was struggling financially, and cutbacks became necessary". (Ex. 20 at p. 11 and p. 16)

## I. SEXUAL HARASSMENT

"Title VII prohibits employment discrimination based on sex and covers a broad spectrum of disparate treatment. 42 U.S.C. § 2000e-2; *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 126 L.Ed. 2d 295, 114 S. Ct. 367 (1993). When the discrimination is not patent, a plaintiff may still prevail by showing that the inappropriate conduct creates a "hostile work environment." *See* 29 C.F.R. § 1604.11(a) (3) (2004). A prima facie case for a hostile work environment requires proof (1) that plaintiff is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition or privilege of her employment; and (5) Defendant knew or should have known of the harassment and failed to take proper remedial action." *Kopp v. Samaritan Health Sys. Inc.*, 13 F.3d 264, 269 (8th Cir. 1993).

"The fourth element involves both objective and subjective components. The harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment" and the victim must subjectively believe that her working conditions have been altered. *Harris*, 510 U.S. at 21-22. "There is no bright line between sexual harassment and merely unpleasant conduct . . ." Hathaway *v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997). Some of the factors we look to include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job." *Duncan v. General Motors Co.*, 300 F.3d at 934 (2002). See also, *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021 at 1026 (2004).

### a) WAS THE HARASSMENT BASED UPON SEX

There is no question that Plaintiff is a member of a protected group by complaining about the harassment. And further, the alleged harassment was unwelcome.

"Whether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. See *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 358 (8th Cir. 1997) (*Montandon*); *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996) (*Quick*); (quoting *Harris Forklift Sys.*

> *Inc.*, 510 U.S. 17, 25, 126 L.Ed. 2d 295, 114 S. Ct. 367 (1993) (*Harris*)
> (Ginsburg, J., concurring)). State differently, the harassment must be
> based on the complaining person's sex. See *Montandon*, 116 F.3d at 358.
> In *Oncale v. Sundowner Offshore Serv. Inc.*, 523 U.S. 75, 81, 140 L.Ed. 2d
> 201, 118 S. Ct. [**14] 998 (1998) (*Oncale)*, the Supreme Court said:
> "whatever evidentiary route the plaintiff chooses to follow, he or she must
> always prove that the conduct at issue was not merely tinged with
> offensive sexual connotations, but actually constituted 'discrimination . . .
> because of ...sex".

*Scusa v. Nestle U.S.A. Company, Inc.*, 181 F.3d 958, at 965 (8th Cir. 1999).

Defendant has a policy against sexual harassment. (Ex. 103) Plaintiff was aware of the policy and watched a video regarding it. (Ex. 104): (TR at 167) Defendant also has an employee watch program regarding sexual harassment and discrimination. (Ex.101) Defendant denies many of Plaintiff's allegations, and argues many of Plaintiff's allegations are not corroborated. (Ex. 20) Defendant does admit Mahoney's behavior was unprofessional and he made rude and offensive utterances to all employees, both male and female. (See for e.g. interviews at Ex. 107); (TR at 220-222)

Mahoney did use crude and profane language with many employees, both male and female, and he did yell and lose his temper. (Ex.107); (TR at 291) However, there were no physical threats, and any specific profane language he may have used against Plaintiff was not that frequent, and/or denied by other employees. (Ex. 20; Ex. 107) The Arbitrator cannot find that the alleged harassment was just based upon sex.

### b) DID THE HARASSMENT AFFECT A TERM, CONDITION OR PRIVILEGE OF PLAINTIFF'S EMPLOYMENT?

Plaintiff has to establish that the alleged harassment was so severe or pervasive that it altered a term, condition or privilege of employment. She must show that the workplace is permeated with discriminatory intimidation, ridicule and insult. *Scusa supra*, 181 F.3d 958 at 966 (1999).

7

"The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview."

*Oncale,* 523 U.S. at 81 (citing *Harris,* 510 U.S., at 21, citing *Meritor,* 477 U.S., at 67).

The Supreme Court also said in *Faragher v. City of Boca Raton:*

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.

524 U.S. 775, 118 S. Ct. 2275, 2283-84, 141 L.Ed. 2d 662 (1998) *(Faragher)* (citations omitted).

The Supreme Court has identified certain factors to consider in determining whether the complained-of conduct is sufficiently severe or pervasive as to constitute sexual harassment under Title VII, and therefore affect the employee's terms and conditions of employment. Specifically, a court should consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23. "More than a few isolated incidents are required."

*Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568, 573 (8th Cir. 1997) (citing Meritor, 477 U.S. at 67)

Mahoney made crude and unprofessional comments directed at many of the employees who work for him. And it did impact Plaintiff's ability to work for Mahoney. Plaintiff took the appropriate action and made a formal complaint to Defendant alleging sexual harassment in February 2010. (Ex. 106)

## c) DEFENDANT KNEW OF THE HARASSMENT AND DID IT TAKE PROPER REMEDIAL ACTION?

Plaintiff argues that, although management had a sexual harassment policy, management failed to effectively alleviate the hostile work environment. (Ex. 112 at p. 120) She argues that, as a result, she requested another position at the dealership, a transfer that she argues was an adverse employment action. (Ex. 112 at p. 120, p. 167-168)

Defendant responded to Plaintiff's complaints in February 2010 when she made Defendant aware of the problems in the workplace. (Ex. 107) An employer is not liable if it takes prompt remedial action which is reasonably calculated to end the harassment once the employer knew or should have known about the harassment. See *Carter v. Chrysler Corp,* 173 F.3d 693, 702 (8th Cir. 1999); *Zirpel v. Toshiba America Info. Sys., Inc.,* 111 F.3d 80, 81 (8th Cir. (1997); *Callanan v. Runyun* 75 F.3d 1293, 1296 (8th Cir. 1996)

Defendant argues, and the Arbitrator agrees, it is clear Defendant took corrective action when it was made aware of the specific harassment complaint by Plaintiff in writing in February 2010, and therefore, is entitled to the *Ellerth-Faragher* affirmative defense. 'The *Ellerth-Faragher* affirmative defense consists of two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Weger v. City of Ladue,* 500 F.3d 710, 718 (8th Cir. 2007).

Defendant had a sexual harassment policy, (Ex. 103) as well as an Employment Watch program regarding sexual harassment and discrimination. (Ex. 101) Plaintiff acknowledged having watched and understood the video employee watch concerning sexual harassment and discrimination. (Ex. 104) Thus there were avenues for Plaintiff to report the harassment, and

9

Defendant had persons who investigated any allegations of harassment. Thus, the Arbitrator determines that the Defendant exercised reasonable care to prevent harassing behavior.

Plaintiff's supervisor, Steve Mahoney, clearly made inappropriate comments and used foul language. He used it against both males and females. (TR at 72-73) Plaintiff was made aware of Defendant's policy for reporting harassment, which included a toll-free Employee Watch system, (Ex. 101) however, Plaintiff failed to utilize this system. (TR at 166; at 218) Plaintiff alleges she made specific sexual harassment complaints to management in September 2009, however this is denied by Defendant and is not corroborated by anyone else or any Exhibit. The evidence shows that when Defendant received a written complaint of sexual harassment, it took appropriate action by investigating the allegations and offered Plaintiff the opportunity to move into a different position with a new Supervisor. (TR at 330) Plaintiff was pleased with Defendant's actions and accepted the offer. (Ex. 108)

Plaintiff's job was terminated along with several other employees, for financial reasons. (Ex. 20 at p. 11 and p. 16)

For the reasons set forth hereinabove, the Arbitrator finds Defendant's Motion for Directed Verdict should be and hereby is denied. The Arbitrator further finds however, that Plaintiff's claim of sexual harassment should also be denied.

IT IS THEREFORE ORDERED that Plaintiff's claim of sexual harassment should be and hereby is denied. Both Plaintiff and Defendant's requests for costs and fees are denied.

BY THE ARBITRATOR,

Patricia A. Lamberty
Retired District Court Judge

10